# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN R. ULVILA, an individual,<br><br>                              Plaintiff,<br>  vs.<br><br>LADDIE BUCK STEFFENS, et. al,<br><br>                             Defendants. | CASE NO. 04CV1268 BTM (CAB)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

On June 22, 2004, Plaintiff Alan Ulvila filed a complaint against multiple defendants alleging twenty-six claims for relief arising from two loans Plaintiff received in 2002. Plaintiff later filed an amended complaint on July 13, 2005. In addition, by orders filed June 22, 2005 and September 20, 2005, this Court dismissed with prejudice Plaintiff's action against many of the Defendants, including Wells Fargo Bank and Russell & Davis Enterprises, LLC. Plaintiff's suit continues with respect to several remaining defendants, including Empire Equity Group, Inc. d.b.a. 1st Metropolitan Mortgage d.b.a. 1st Metro d.b.a. First Metro (hereinafter "Empire"). On March 1, 2006, Empire filed a motion for summary judgment.[1]

For the reasons discussed below, the Court **DENIES** Defendant's motion.

---

[1] Empire filed a supplemental reply brief in support of this motion in which it argued that the Plaintiff admitted in a deposition that Empire was not liable for the actions of Buck Steffens. However, the Plaintiff subsequently filed a request to withdraw this admission, which Magistrate Judge Bencivengo granted by order on May 30, 2006. See Docket # 117. Judge Bencivengo recommended that the supplemental reply brief be stricken. The Court adopts her recommendation and therefore has not considered the supplemental briefing in ruling on the current motion.

## I. FACTUAL BACKGROUND

In 2002, Plaintiff claims to have been facing foreclosure on his home and Chapter 13 bankruptcy. (Decl. of Alan Ulvila in Support of Opposition to Def.'s Motion for Summary Judgment (hereinafter "Ulvila Decl.") ¶ 3.) On or about July 12, 2002, Plaintiff alleges that Defendant Buck Steffens visited him at his home, offering brokerage services to help him obtain a loan to pay off Plaintiff's first and second mortgages, as well as his bankruptcy debts. (Ulvila Decl. ¶¶ 4-6.) Plaintiff further alleges that Buck Steffens gave him a business card representing that he was employed as a mortgage broker for 1st Metro. (Id. ¶ 7.)

Plaintiff initially agreed to obtain a loan only if it would be enough to cover all of his debts and include some extra spending money, which would require a total of $230,000. (Id. ¶ 5.) Though he initially indicated that Wells Fargo would be willing to make such a loan, Buck Steffens ultimately secured only a $187,000 commitment from Wells Fargo. (Id. ¶ 8.) The Wells Fargo loan was processed at 1st Metro's branch in Oceanside, CA by Defendant Donna Steffens, who was the branch manager at that time. (See Def.'s Lodgment of Exhibits in Support of Motion for Summary Judgment, Ex. F at 3 [Donna Steffens Dep. at 87]; Pl.'s Evidence in Support of Opposition for Motion for Summary Judgment, Ex. C [Buck Steffens Dep. at 18].) Plaintiff was told by Buck Steffens that he would need to obtain an additional $15,000 loan in order to pay off all of his debts. (Ulvila Decl. ¶ 8.) Approximately one month later, Mr. Steffens told Plaintiff that he would actually need an additional $40,000 loan, not $15,000, in order to pay off all his debts. (Id. ¶ 9.) In reliance upon Mr. Steffens' representations, in early November 2002, Plaintiff executed a $40,000 promissory note to Russell & Davis Enterprises, LLC ("R&D"). (Id.) Plaintiff also unknowingly executed a grant deed conveying his home to R&D, although Mr. Steffens had represented that the documents would only convey a security interest in the home to secure the mortgage. (Id. ¶ 11-13.) R&D never paid any funds to Plaintiff, but an entity known as Gold Coast Management deposited $26,688.83 into the escrow account established for Plaintiff through Old Republic Title Company. (Id. ¶ 15.)

Meanwhile, approximately six weeks earlier, on September 20, 2002, Empire closed its purchase of 1st Metropolitan Mortgage Co. (aka 1st Metro). (Supp. Aff. of Daniel Jacobs, Ex. D (hereinafter "Purchase Agreement") § 2.05, at 12.) The agreement provides for the immediate transfer of all 1st Metropolitan Mortgage Co.'s "right, title and interest in, to [sic] the assets, properties, goodwill and business of every kind and description and wherever located, whether tangible or intangible, real, personal or mixed, belonging to or used or intended to be used in [1st Metro's mortgage loan brokerage and origination business] other than the Excluded Assets . . .." (Id. § 2.01, at 7.) The "Excluded Assets" included 1st Metro's state licenses and, as Empire did not yet have the required regulatory licenses to operate in all the states in which 1st Metro had branch offices, the assignment of the leases for 1st Metro's branch offices would not be effective until Empire obtained the required approvals. (Id. §§ 2.01(a)(x),(c)(v) and 6.04(b), at 8-9, 43.)

During this "Transition Period", Empire and 1st Metro agreed to operate under an Interim Branch Operations Agreement, which provided that 1st Metro would continue to conduct the branch operations. (Supp. Aff. of Daniel Jacobs, Ex. E (hereinafter "IBO Agreement") ¶ 2, at 1.) The IBO Agreement states that the Transition Period would end upon Empire's receipt of the necessary regulatory licenses, but in no event later than January 31, 2003. (Id.) During this period, 1st Metro branch employees would continue to be employees of 1st Metro and they would be supervised by Eli Mellul "in his capacity as an officer of [1st Metropolitan Mortgage Co.] in a manner consistent with his duties contemplated in his employment agreement with Empire."[2] (Id. ¶ 4, at 2.) The salaries of 1st Metro employees would be paid from an account funded by Empire and over which Empire held ultimate authority. (Id. ¶¶ 3(b), 4, at 2.) In addition, all funds relating to 1st Metro's business that were received by the branches during the Transition Period were to be deposited into a bank account designated and controlled by Empire. (Id. ¶ 3(a), at 2.)

---

[2] As recited in the preamble to the Purchase Agreement, Eli Mellul owned 100% of the stock of the parent and controlling stockholder of 1st Metropolitan Mortgage Co. (Purchase Agreement at 1.)

1  Empire was ultimately licensed as a California Residential Mortgage Lender on July
2  10, 2003. (Def.'s Lodgment of Exhibits in Support of Motion for Summary Judgment, Ex. C.)
3  Plaintiff claims that Empire is vicariously liable for the actions of Donna and Buck
4  Steffens in connection with the two mortgage loans brokered by the Steffens in late 2002.
5  (Pl.'s Memorandum of Points and Authorities in Support of Opposition for Motion for
6  Summary Judgment (hereinafter "Opposition") ¶¶ 7-8.)  Although it is undisputed that 1st
7  Metro processed the Wells Fargo loan, Empire claims that Buck Steffens arranged the R&D
8  loan under the auspices of his own company, Ameriteam, USA, and that 1st Metro did not
9  process or receive any money from that loan. (Def.'s Separate Statement of Undisputed
10 Facts in Support of Motion for Summary Judgment, Nos. 11-12.)

## II.  LEGAL STANDARD

Summary judgment is appropriate if the moving party demonstrates that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson, 477 U.S. at 248; Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. See Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. Although the nonmoving party may bear the burden of proof on a matter at trial, the moving party bears the burden of demonstrating to the Court that there is insufficient evidence to support the nonmoving party's case. Id. at 325. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proof at trial.

See Id. at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. See Celotex, 477 U.S. at 314.  The nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (citing Fed. R. Civ. P. 56(c)).  When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001).  The court must not weigh the evidence or make credibility determinations in evaluating a motion for summary judgment. See Anderson, 477 U.S. at 255.

**III.   DISCUSSION**

Empire insists that summary judgment is appropriate because it cannot be held vicariously liable for the acts of either Donna or Buck Steffens due to the fact that it did not finalize its purchase of 1st Metro until July 2003, well after the events in question here, which occurred in November 2002.[3]  Plaintiff, on the other hand, contends that summary judgment cannot be granted because material issues of fact remain in dispute regarding the possible employment relationship between Empire and Donna and/or Buck Steffens.  Plaintiff asserts that Empire became vicariously liable for the actions of Buck and Donna Steffens beginning with its purchase of 1st Metropolitan Mortgage Co. on September 20, 2002.

---

[3] It should be noted that Empire's liability, if any, would presumedly derive from Plaintiff's state law claims because Empire, as mortgage brokers and/or originators, are not liable as "creditors" under the Truth in Lending Act, 15 U.S.C. § 1602. See, e.g., Viernes v. Executive Mortgage, Inc., 372 F. Supp. 2d 576, 581 (D. Haw. 2004).

Plaintiff has raised several arguments in opposition to Empire's motion. First, Plaintiff contends that Empire's failure to provide requested documents warrants denial under Fed. R. Civ. Pro. 56(f). Specifically, he claims that Empire's refusal to produce certain employment agreements and complete (unredacted) versions of the Purchase Agreement prejudices his ability to defend against the motion. He asserts that Empire controls employment records that are relevant to whether the Steffens were in fact Empire employees during the period in question. Empire has stated that it has provided these agreements in their entirety, with the exception of information it considered privileged. However, this Court finds that the agreements as provided fail to sufficiently address the substantial material questions of fact that remain.

For instance, the IBO Agreement, as produced, purports to define the relationship of 1st Metro and its employees to Empire, and supports Empire's argument that the Steffens were not Empire's employees during November 2002. (IBO Agreement ¶¶ 4, 16, at 2-4.) However, an employment relationship is found when sufficient facts exist to support such a finding and the IBO Agreement's statements are not controlling in this determination.

The question of whether Buck and/or Donna Steffens were employees of Empire is a question of California law.

> The California Labor Code defines an employee as one engaged "to do something for the benefit of the employer or a third person." Cal. Lab. Code § 2750 (West 1989). Under California law, whether a person is an employee depends on the degree of control the purported employer has a right to exercise over that person. *Burlingham v. Gray*, 22 Cal. 2d 87, 99, 137 P.d 9, 15 (1943) (en banc). Where the purported employer has the right to control the mode and manner of doing work, an employer-employee relationship exists. *Id.* at 99-100, 137 P.2d at 15-16.

Randolph v. Budget Rent-A-Car, 97 F.3d 319, 325 (9th Cir. 1996). See also Restatement (Second) of Agency § 220 (1958) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right of control."). The degree of control that Empire could exercise over the work of any 1st Metro employee is a material fact that remains in dispute. The IBO Agreement specifically provides that 1st Metro employees would be supervised by Eli Mellul "in a manner consistent with his duties contemplated in his

employment agreement with Empire." (IBO Agreement ¶ 4, at 2.) What exactly is meant by this statement is unclear from the words of the IBO Agreement itself and an examination of the "employment agreement" referred to in this section, which Empire has not produced, appears to be necessary to illuminate the relationship between Empire and Mellul; and by extension, Empire and the 1st Metro employees. The fact that, under the IBO Agreement, 1st Metro "employees" would be paid from an account controlled by Empire and all funds received by 1st Metro branches were deposited into Empire's bank account is also significant in assessing the degree of control that Empire exercised, *or had the right to exercise*, over the work of the Steffens during the Transition Period.

Empire has argued that it did not have employment agreements with either Donna or Buck Steffens and that both identified themselves as independent contractors in their depositions. Buck Steffens' testimony supports this contention, as he clearly indicated that he was not an employee of 1st Metro, but rather was an independent contractor. (Decl. of David P. Burke in Support of Def.'s Reply Brief in Support of Their Motion for Summary Judgment, Ex. 1 at 2 [Buck Steffens Dep. at 16].) However, Donna Steffens' testimony undermines Empire's claim as she testified that she was employed as a branch manager for 1st Metro, at least in 2001. (Pl.'s Evidence in Support of Opposition for Motion for Summary Judgment, Ex. D [Donna Steffens Dep. at 14].) In addition, the Steffens' own characterization of their employment relationships would not be controlling on this Court anyway.

There are independent reasons to doubt Empire's contentions on this subject as well. As Plaintiff pointed out in his opposition brief, a licensed California Residential Mortgage Lender, which 1st Metro ostensibly was, cannot provide brokerage services through independent contractors. See California Financial Code § 50700(d)(1). Thus, 1st Metro would appear to have been violating the law if the Steffens were brokering under 1st Metro's license, but as independent contractors. In addition, Plaintiff has produced a March 14, 2003 letter from Empire that indicates Donna Steffens was an Empire employee at that time. (Pl.'s Evidence in Support of Opposition for Motion for Summary Judgment, Ex. F.) Empire has

responded that the letter is consistent with its interpretation of the IBO Agreement, which provides that it will terminate on January 31, 2003 at the latest. Empire contends that, accordingly, Donna Steffens became an Empire employee at that time, even though Empire did not receive the required California mortgage license until nearly 6 months later. (Reply Brief in Support of Def.'s Motion for Summary Judgment (hereinafter "Reply") at 3.) The obvious question arises as to whose license Ms. Steffens was operating under during this time period. While this question does not go to the heart of Plaintiff's claim, the absence of a coherent answer gives reason to believe that the employment relationship involving the Steffens, 1st Metro, and Empire is not as clear-cut as Empire hopes to portray in this motion. Thus, material issues of fact remain in dispute as to the employment status of both Buck and Donna Steffens in their brokerage work.

Other provisions of the Purchase and IBO Agreements also highlight reasons for disputing the validity of Empire's contentions of non-liability. To begin, while the Purchase Agreement indicated that the leases for 1st Metro's branch offices would not be assigned to Empire until Empire acquired the necessary regulatory licenses in each state, the transfer contemplated by the agreement was otherwise substantially complete upon the September 20, 2002 closing. This transfer included the entirety of 1st Metropolitan Mortgage Co.'s business, including its name. (Purchase Agreement § 2.01, at 7-8.) As Plaintiff indicated in his declaration, he believed that he was dealing with employees of 1st Metro in all interactions with the Steffens. (Ulvila Decl. ¶¶ 19-20.) If the Steffens had the apparent authority to act for 1st Metro, and Empire acquired that name on September 20, 2002, then the Steffens may have had apparent authority to act for Empire beginning on that date. The Court need not reach the issue of whether Empire can be held liable for the Steffens' actions based upon this apparent authority, but merely recognizes that the issue exists and material facts necessary to its resolution remain in dispute.

The Purchase Agreement also specifically states that 1st Metro retains liability for "claims relating to services performed by [1st Metro or its affiliates] on or prior to the Closing Date" of September 20, 2002. (Purchase Agreement § 2.03(b)(ii)(1), at 11.) The

agreement's carving out of pre-closing liabilities supports the view that Empire is liable for all claims relating to services performed by 1st Metro or its affiliates after the closing – *expressio unius est exclusio alterius*.  Such claims may include Plaintiff's, which relate to services performed after the closing by individuals who were potentially 1st Metro employees.

Empire's other contentions in support of its motion are also ultimately unconvincing. Empire argues that the "sole dispute in this case revolves around the Russell & Davis loan." (Reply at 4.) However, Plaintiff specifically states in his opposition brief that "it is not true that Plaintiff alleges wrongdoing only with regard to the Russell & Davis loan," and he goes on to allege statutory violations in connection with the Wells Fargo loan.  (Opposition ¶ 8.) Empire has also argued that it has appropriately responded to Plaintiff's discovery requests. It claims that, since "Donna Steffens testified that plaintiff's Wells Fargo loan was processed exclusively at the Oceanside branch[,] [t]his means none of the schedules and agreements plaintiff seeks regarding Elie Mellul or any 1st Metropolitan employees outside the Oceanside branch are relevant to this motion or even this lawsuit." (Reply at 5.) The potential relevance of any Empire/Elie Mellul agreement has already been discussed above, and Empire's conclusory statements to the contrary do not convince this Court otherwise.

## IV.   CONCLUSION

For all of the foregoing reasons, material issues of fact remain in dispute as to Empire's potential liability for the actions of Defendants Buck and Donna Steffens. Accordingly, Empire's motion for summary judgment [Doc. #68] is **DENIED**.

**IT IS SO ORDERED.**

DATED: November 9, 2006

*/s/ Barry Ted Moskowitz*
Hon. Barry Ted Moskowitz
United States District Judge